UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SONDRA ZENTS, | ) | CASE NO. 5:11CV1941 |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | ) | |
| | ) | |
| BAYLOR TRUCKING COMPANY, | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

This matter is before the Court on the motion for summary judgment filed by Defendant, Baylor Trucking Company on December 31, 2012. ECF Dkt. #29. On February 15, 2013, with leave of Court, Plaintiff, Sondra Zents filed a brief in opposition to the motion, ECF Dkt. #39, and an amended opposition brief, which was filed on February 22, 2013. ECF Dkt. #43. Defendant filed a reply brief on March 11, 2013. ECF Dkt. #45.

Plaintiff contends that Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. §2000, et seq. ("Title VII"), and Chapter 4112 of the Ohio Revised Code, which prohibit discrimination based upon sex, when Defendant initially refused to hire Plaintiff as an owner-operator in late February of 2010 (Plaintiff contracted with Defendant to become an owner-operator approximately one month later on March 26, 2010), and then again when Defendant terminated Plaintiff's owner-operator status less than one year later on December 28, 2010. Defendant argues that Plaintiff failed to file a timely charge with the EEOC regarding Defendant's initial refusal to hire her as an owner-operator, and as a consequence, her federal sex discrimination claim predicated upon Defendant's initial action must be dismissed. In the alternative, Defendant asserts that, because Plaintiff was seeking a position as an independent contractor, her state sex discrimination claim predicated upon

1

Defendant's initial refusal to hire her as an owner-operator must be dismissed.  Likewise, Defendant argues that Plaintiff was an independent contractor when her employment with Defendant was terminated, and, as a consequence, her federal and state discrimination claims based upon her termination must also be dismissed as a matter of law.  Finally, Defendant asserts that even if Plaintiff is an "employee" as that term is defined by Title VII, rather than an independent contractor, she cannot establish her prima facie case, or demonstrate that the legitimate business reason for her termination, that is, she was cited for a preventable "DOT recordable" accident in Virginia, was pretexual. For the following reasons, the motion for summary judgment is granted.

## I.      STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides in pertinent part that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also* Fed. R. Civ. P. 56, Advisory Committee Notes ("The standard for granting summary judgment remains unchanged" despite 2010 amendments to Rule 56).  Rule 56(c)(1) outlines the procedures for supporting or opposing a motion for summary judgment, stating that:

> (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009).  Rule 56(c)(3) provides that the Court need only consider cited materials in determining a motion for summary judgment, but the Court may consider other materials presented in the record

2

but not called to the Court's attention by the parties.  Fed. R. Civ. P. 56(c)(3), advisory committee notes to 2010 Amendments.

The party moving for summary judgment has the burden of showing there exists no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  If the moving party meets his burden, the nonmoving party must take affirmative steps to avoid the entry of a summary judgment.  *See* Fed.R.Civ.P. 56(e). To refute such a showing, the nonmoving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 322. A mere scintilla of evidence is not enough; the evidence must be such that a reasonable jury could find for the nonmovant.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II.    FACTS

The following facts are not in dispute unless otherwise noted.  Defendant is in the interstate trucking business.  Plaintiff attended TDDS Technical Institute and obtained her commercial truck driver certification shortly after passing her high school equivalency tests in 1984.  ECF Dkt. #34, Deposition of Sondra Zents at 11. Prior to becoming a company driver for Defendant, Plaintiff worked for Patriot Express from August 2005 to September 2006.  Patriot Express was owned by Randy Jones, an owner/operator contracted to carry freight on behalf of Defendant.  In turn, Mr. Jones employed Plaintiff to drive his truck.  Before performing work for Defendant (on behalf of Mr. Jones), Plaintiff had to be approved by Defendant's safety department.

On December 1, 2009, Plaintiff completed a "Company Driver Application" for Defendant. *Id.* at 16. About a week later she was employed by Defendant as a company driver. *Id.* at 25. Plaintiff was paid approximately thirty-seven cents per mile.  *Id.* The truck she drove was owned by Defendant. Id. at 29-30. Prior authorization from Defendant was required in the event that the truck needed to be repaired. *Id.* at 30. Similarly, prior authorization from Defendant was required when regular maintenance was performed on the truck. *Id.* at 32. As a company driver, Plaintiff wore a shirt with Defendant's logo Id. Furthermore, as a company driver, Plaintiff "had to take all the routes

3

that were given to her by the dispatcher . . . [she] didn't have the option of turning any of them down." *Id.* at 33, 82-83.

Plaintiff conceded at her deposition that she began her employment with Defendant with the ultimate objective of becoming an owner-operator. *Id.* at 26, 37. Unlike a company driver, an owner-operator has a choice to reject certain hauls to certain locations. *Id.* at 26. An owner-operator gets paid ninety-four cents per mile. *Id.* at 26-27, 37-38. Furthermore, the "fuel surcharge" paid by Defendant's customers is passed through to owner-operators but not to company drivers. *Id.* at 15, 25, 38-40.

At her deposition, Plaintiff acknowledged she had to be with the company at least two months before she could become an owner-operator." *Id.* at 41-42. After Plaintiff had been a company driver for approximately two months, she approached Ben Hammond ("Mr. Hammond"), Defendant's Director of Operations, to become an owner-operator. At that time, Mr. Hammond informed Plaintiff that she first needed to demonstrate that she could drive the requisite number of miles. *Id.* at 42.

When a driver becomes an owner-operator, he or she may also enter into a Lease-Purchase Agreement with Baylor Leasing, Inc. ("Baylor Leasing")[1], in order to become the owner of his or her own truck. *Id.* at 43. Baylor Leasing finances the truck, and the now owner-operator-lessee pays it off over time. *Id.* at 44. An owner-operator-lessee must drive a requisite number of miles each month in order to generate sufficient income to fund the monthly payments on the truck. *Id.* at 45-46.

Plaintiff testified that an owner-operator-lessee would need to drive at least 2,800 miles per week to be able to fulfill the terms of the Lease-Purchase Agreement. *Id.* at 46. Plaintiff conceded at her deposition that she was not meeting the requisite mileage minimum at the time she first spoke to Mr. Hammond. According to Plaintiff, she was not meeting the minimum mileage requirement because Defendant did not assign to her the routes she needed to achieve that milestone. *Id.* at 46-47. However, over the course of the next month, Plaintiff increased her mileage to meet the minimum mileage requirement. *Id.* at 50-51.

---

[1]Baylor Leasing is an entirely separate, independent entity from Baylor Trucking. Hammond Dep. at 116-17.

On March 26, 2010 Plaintiff completed an "Independent Contractor Driver Application" to become an owner-operator for Defendant. Plaintiff's Dep. at 60-61. On that same date Plaintiff executed an "Independent Contractor Agreement" with Defendant and an "Equipment Lease with Option to Purchase Agreement" (the "Lease-Purchase Agreement") with Baylor Leasing. *Id.* at 43, 62.

Paragraph 16 of the Independent Contractor Agreement executed by Plaintiff on March 26, 2012, reads, in pertinent part:

> CONTRACTOR NOT EMPLOYEE OF CARRIER. It is expressly understood and agreed that CONTRACTOR is an independent contractor for the Equipment and driver services provided pursuant to this Agreement . . . CONTRACTOR hereby assumes full control and responsibility for all hours scheduled and worked, wages, salaries, workers' compensation and unemployment insurance, state and federal taxes, fringe benefits, and all other costs relating to the . . . labor provided by CONTRACTOR pursuant to this Agreement . . .For the purposes of this section, the term CONTRACTOR refers to the owner of the Equipment as well as drivers that may be operating the Equipment on behalf of the owner. As required by law, CARRIER agrees to file information tax returns (form 1099) on behalf of CONTRACTOR if CONTRACTOR is paid more than the statutory amount in compensation during a calendar year.

ECF Dkt. #34-3 at p. 33.

Similarly, Paragraph 17 of the Lease-Purchase Agreement reads, in pertinent part:

> Independent Contractor. Lessee [i.e., Plaintiff] is an independent contractor and shall not be deemed an employee or agent of Baylor. Baylor shall not be construed as the employer of Lessee upon the execution of this Agreement, nor shall any of the employees, agents and representatives be deemed employed by Baylor. As such, Lessee shall be responsible for the payment of all taxes, license fees, user fees upon the use and operation of the Equipment.

ECF Dkt. #34-4 at p. 6.

Upon becoming an owner-operator-lessee, Plaintiff returned the truck she had been driving as a Company Driver to Defendant. Id. at 72. Plaintiff also returned the load lock and straps that had been issued to her as a Company Driver. *Id.* Her driver code changed from "ZENSO" to "ZENSON" and she was offered loads from a different dispatcher. Hammond Aff. ¶ 5; Plaintiff's Dep. at 80.

As an owner-operator-lessee, Plaintiff received no vacation or sick leave. Plaintiff's Dep. at 75-76. Defendant did not withhold taxes from Plaintiff's settlements. *Id.* Likewise, Plaintiff received no other employee benefits such as workers compensation coverage or healthcare benefits. Hammond Aff. at ¶ 9. Plaintiff paid her own insurance. Plaintiff's Dep. at 75-76. Furthermore,

Plaintiff was responsible for all of the maintenance on her truck and the operational expenses. *Id.* at 86.

As an owner-operator-lessee, Plaintiff was required to provide her own communication or Qualcomm device. Defendant was provided the device free of cost when she was a company driver. ECF Dkt. #36, Deposition of Ben Hammond at 123-124. As a company driver, Plaintiff was required to use the Comdata fuel card provided by Defendant to purchase fuel, and prior authorization by Defendant was required before she could use the card. *Id.* at 127-129. As an owner-operator-lessee, Plaintiff received a different Comdata card with no restrictions as to fueling locations or amounts, and she did not need to obtain prior authorization before using the card. *Id.* As an owner-operator-lessee, Plaintiff could hire someone else to perform deliveries with her truck.[2] Plaintiff's Dep. at 87. Finally, as an owner-operator-lessee, Plaintiff was not required to wear Defendant's logo when making a delivery. *Id.* at 72.

Pursuant to the Independent Contractor Agreement, both Plaintiff and Defendant had the right to terminate the agreement "for any reason by giving one (1) day's written notice." ECF Dkt. #34-3 at 25. In the event the Independent Contractor Agreement was terminated prior to Plaintiff's fulfillment of the Lease-Purchase Agreement, that is, prior to Plaintiff paying in full the purchase price of the truck, she had the option of paying off the balance owed, or returning the equipment to Baylor Leasing. ECF Dkt. #34-4 at p. 4. Plaintiff also could have placed another qualified driver in the truck and continued performing services for Defendant. Hammond Dep. at 120.

On December 6, 2010, Plaintiff was cited for her part in a preventable, "DOT recordable"[3] accident in Clifton Forge, Virginia. Plaintiff's Dep. at 92, 104. The police were called to the scene of the accident and the other vehicle had to be towed. Id. at 102. Plaintiff acknowledged at her deposition that even if she ultimately were found not to be at fault, the accident would remain

---

[2]As stated previously, prior to being employed as a company driver, Plaintiff worked for an owner-operator, who hired her to perform deliveries for Defendant with his truck. *Id.* at 12-13.

[3]"Recordable" or "DOT recordable"is a classification given to an accident by the Department of Transportation as involving either a fatality, an injury requiring medical treatment away from the scene, or a disabled vehicle requiring a tow from the scene. See 49 CFR §390.5.

classified as a "recordable" accident. *Id.* at 34, 104.  After the accident, Plaintiff returned to Defendant's headquarters in Milan, Indiana, and reported to Defendant's Safety Director, Andy Koziel. *Id.* at 106.  According to Mr. Hammond, Plaintiff's Independent Contractor Agreement was terminated because of the circumstances associated with her "preventable DOT recordable accident." Hammond Dep. at 26.

### III.  LAW AND ANALYSIS

Title VII provides in relevant part that "[I]t shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §2000e-2. Similarly, Ohio R.C. §4112.02 provides that "[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the ... sex ... of any person, to discharge without just cause to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

The Sixth Circuit has held that courts may appropriately analyze these two claims together. See *Gettings v. Bldg. Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 305 (6th Cir.2003) ("federal and state law claims of [sex] discrimination may be [analyzed] together"); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 195, 421 N.E.2d 128 (1981).  Likewise, Ohio courts have held that federal case law interpreting Title VII is "generally applicable" to cases involving sexual harassment claims under Ohio Rev. Code §4112. *Hawkins v. Anheuser–Busch, Inc*., 517 F.3d 321, 332 (6th Cir.2008).

Title VII empowers "person[s] claiming to be aggrieved" to bring civil actions to enforce the statutes' substantive prohibitions against unlawful employment practices. An "employee" is defined as "an individual employed by an employer...." 42 U.S.C. §2000e(f). Because this definition "is completely circular and explains nothing," *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (describing same definition under ERISA), the Supreme Court has instructed courts to interpret the term "by incorporating the common law of agency." *Ware v. United States*, 67 F.3d 574, 576 (6th Cir.1995) (citing *Darden*, 503 U.S. at 322–24, 112 S.Ct. 1344

(ERISA); *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ("work made for hire" provisions of the Copyright Act of 1976); *United Ins. Co.*, 390 U.S. at 258, 88 S.Ct. 988 (National Labor Relations Act ("NLRA"))). The Supreme Court in *Darden* echoed *Reid* writing:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24, 112 S.Ct. 1344 (quoting *Reid*, 490 U.S. at 751–52, 109 S.Ct. 2166) (citing Restatement (Second) of Agency §220(2) (1958); Rev. Rul. 87–41, 1987–1 C.B. 296, 298–299). The Sixth Circuit has applied the common-law agency test, articulated first in *Reid* and then in *Darden,* to determine whether an employment relationship exists under different statutes, particularly in the context of distinguishing employees from independent contractors. See *Weary v. Cochran*, 377 F.3d 522, 524–25 (6th Cir.2004)(Age Discrimination in Employment Act ("ADEA")); *Shah v. Deaconess Hosp.*, 355 F.3d 496, 499-500 (6th Cir.2004)(Title VII and ADEA)*; Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir.1998) (Americans with Disabilities Act ("ADA"))*;* Ware, 67 F.3d at 576-78 (Internal Revenue Code). As a general rule, federal employment discrimination statutes protect employees, but not independent contractors. *See* Johnson v. City of Saline*,* 151 F.3d 564, 567-69 (6th Cir.1998) (ADA); *Simpson v. Ernst & Young*, 100 F.3d 436, 443 (6th Cir.1996)(ADEA); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 877 (6th Cir.1991) (Title VII); *Falls v. Sporting News Publ'g Co.*, 834 F.2d 611, 613 (6th Cir.1987)(ADEA and Title VII). Likewise, the Sixth Circuit has concluded that the Ohio statute does not protect independent contractors. *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218-219 (6th Cir.1992)(relying on statutory language of R.C. 4112.02).

**A.     TIMELINESS**

As a matter of initial concern, Defendant contends that Plaintiff's federal sex discrimination claim predicated upon Defendant's initial refusal to hire her as an owner-operator must be dismissed as a matter of law because Plaintiff filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") more than 300 days after her discharge.  Plaintiff offers no argument to the contrary.[4]

Before a plaintiff alleging discrimination under Title VII can bring suit in federal court, he or she must satisfy two administrative prerequisites: "(1) by filing timely charges of employment discrimination with the EEOC, and (2) receiving and acting upon the EEOC's statutory notices of the right to sue." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir.1989)(citing 42 U.S.C. §2000e-5(f)(1); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Pursuant to 42 U.S.C. § 2000e-5(e)(1), a charge is timely when the aggrieved filed with the EEOC within 180 days after the allegedly unlawful practice occurred. 42 U.S.C. §2000e-5(e)(l); *Nichols v. Muskingum College*, 318 F.3d 674, 679-80 (6th Cir.2003); see also 42 U.S.C. §12117(a); *Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir.2001).  Because Ohio  has enacted state laws prohibiting employment discrimination, it is a "deferral state" for the purposes of federal discrimination statutes. Accordingly, Plaintiff had 300 days within which to file a charge of discrimination instead of 180 days as is the case in non-deferral states. See *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375–76 (6th Cir.2002).

The one-month delay in becoming an owner-operator that resulted from Defendant's allegedly discriminatory conduct ended on March 26, 2010, when Plaintiff contracted with Defendant to become an owner-operator.   However, Plaintiff did not file her EEOC charge until March 8, 2011. As a consequence, Plaintiff's federal  sex discrimination claim predicated upon Defendant's initial refusal to hire her as an owner-operator is untimely.  However, her state sex discrimination claim

---

[4]Plaintiff writes, "There are limited damages arising from [Plaintiff's claim predicated upon Defendant's initial failure to contract her as an owner-operator] because she became a lessee one month later after she complained to the owner's wife.  Its relevance is important, however, because it shows the company's bias toward women."  ECF Dkt. #39 at p. 1.

9

based upon the same conduct survives under the Ohio statute. *Meyer v. United Parcel Serv., Inc.*, 122 Ohio St. 104, 2009–Ohio–2463, 909 N.E.2d 106, 111–12, at ¶¶ 23–24 (Ohio Rev. Code Ann. §2305.07's general six-year statute of limitations is applicable to sex discrimination claims).

### B.    PLAINTIFF'S STATUS AS AN INDEPENDENT CONTRACTOR

Defendant contends that owner-operators are independent contractors, and, therefore, are not protected by the federal and state anti-discrimination statutes.  In its motion, Defendant cites two cases with facts remarkably similar to the facts in the above-captioned case, in which federal courts have applied the common law agency test and concluded that commercial truck drivers are independent contractors. See *Laredo v. CRST Malone, Inc.*, 820 F. Supp.2d 698 (E.D.N.C. 2011), and *Taylor v. BP Express, Inc.*, 2008 WL 5046071 (S.D. Ga. 2008).

In *Laredo*, *supra*, as in the instant case, the plaintiff claimed she was a victim of sex discrimination while driving for CRST, a trucking company that engaged in the transportation of general commodity freight.  After recognizing that Title VII protection is only available to employees and not to independent contractors, and that whether or not a party was or could have been an independent contractor is a question of law, the Court proceeded to apply the traditional principles of agency law in order to determine whether the plaintiff was an independent contractor. *Laredo*, 820 F. Supp.2d at 702.  The *Laredo* Court provided the following analysis of the independent contractor issue:

> First, the application completed by Plaintiff at the orientation program in 2007 states, in bold lettering, "Application for Lease/Independent" and the agreement she would have been required to sign had she been selected to drive for CRST is titled "Independent Contractor Operating Agreement", evincing that the parties understood that the nature of their working relationship would have been as a carrier and independent contractor. Driving tractor-trailers is skilled work that requires special licensure, and while some drivers lease their tractor-trailers from a subsidiary of CRST, others use their own equipment when driving for CRST.
>
> Plaintiff and CRST agree that the drivers control the routes they take, that drivers may decline to take a run, and that the drivers have discretion over when and how long they work.  Plaintiff contests CRST's assertion that drivers are paid based on a percentage of the receipts generated from each load that they haul, but there is no evidence in the record that CRST drivers are paid hourly, salary, or by any other rate based on time at work. Plaintiff has conceded that taxes are not withheld from CRST drivers' pay and that neither sick leave nor vacation benefits are available to drivers.

> When considered together, even in light of those issues about which Plaintiff and CRST disagree, the weight of factors tilts decidedly in favor of finding that Plaintiff would have been an independent contractor had she been a driver for CRST. Independent contractors are not protected by the anti-discrimination provisions of Title VII, making it unnecessary for the Court to consider whether CRST or its employees had a discriminatory motive in not hiring or terminating Plaintiff.

*Id.* at 701-02 (record cites omitted). As a consequence, the court granted summary judgment to CRST. *Id.* at 702.

In *Taylor v. BP Express*, *supra*, the plaintiff asserted a sex discrimination claim against BP Express, a common motor carrier. The plaintiff in *Taylor*, like Plaintiff in the above-captioned case, also entered into an "equipment lease agreement" with BP Express. Id. at *2. Pursuant to the lease agreement with BP Express, she leased a Freightliner truck, coincidently, the same make truck Plaintiff leased from Defendant in the case *sub judice.* The lease agreement in *Taylor*, like the Lease-Purchase Agreement at issue here, specifically provided:

> The parties intend to create by this Agreement the relationship of COMPANY and INDEPENDENT CONTRACTOR and NOT that of EMPLOYER and EMPLOYEE. Neither the CONTRACTOR, nor his agents, servants or employees are to be considered employees of [BP Express] at any time or for any purpose.

Id. at *2-3.[5]

The *Taylor* Court applied the eleven common law principles and ultimately determined that Plaintiff was an independent contractor.

> The first, second, third, fourth, fifth, sixth, seventh, ninth, tenth, and eleventh factors point very clearly to the conclusion that Plaintiff is an independent contractor. The first factor considers whether Plaintiff performed the "type of work done by a specialist without supervision." Here, Plaintiff received little to no supervision for her work at BP Express. Both parties agree that Scott Kirby was Plaintiff's supervisor. However, Kirby simply provided Plaintiff with the appropriate documents and pin numbers to make her hauls. Kirby did not oversee the details of her job performance in making the hauling trips.
>
> * * *
>
> The second factor, the skill required for this occupation, requires a finding that Plaintiff is an independent contractor. First, a significant amount of skill is required to operate a truck. Further, federal and state laws impose licensing requirements for commercial truck drivers. Indeed, when a worker has procured a state license, this fact

---

[5]The lease agreement in *Taylor* required the plaintiff to maintain Defendant's logo on both doors of her vehicle and restricted the use of her vehicle to BP Express. In other words, the plaintiff in *Taylor* was prohibited from using her truck to haul for other companies. *Id.* at *6-7.

11

weighs in favor of independent contractor status. Thus, the considerable skill and licensing requirements for Plaintiff's profession indicate that she is an independent contractor.

Turning to the third factor, Plaintiff provided the 1996 Freightliner truck, the equipment necessary to perform the work. Plaintiff also had to pay for all expenses associated with operating her truck such as fuel, oil, and maintenance. This factor favors the conclusion that Plaintiff is an independent contractor.

As for factor number four, the longer the working relationship, the more likely the individual is an employee. Plaintiff was only employed by BP Express for a period of seven weeks. The short duration of the working relationship weighs in favor of a finding that Plaintiff is an independent contractor.

Factor number five examines the employer's method of payment. The method of payment in this case indicates that Plaintiff is an independent contractor. Plaintiff was paid per trip, rather than by the hour. Payment by the job completed, rather than a salaried or hourly payment, signals an independent contractor relationship.

Turning to factor number six, the fact that both BP Express and the Plaintiff had the ability to terminate the working relationship indicates that Plaintiff is an independent contractor. Here, the Lease Agreement provided that each party could terminate the agreement without notice.

Next, Plaintiff was not afforded annual leave, did not accumulate retirement benefits, and BP Express did not pay any social security tax in connection with Plaintiff. Thus, factors, 7, 9, and 10 weigh heavily in favor of the conclusion that Plaintiff is not an employee.

The final factor for the Court to consider is the intention of the parties. The terms of the agreement serve as the manifestation of the parties' intent. Further, contract provisions that refer to Plaintiff as a "contractor" must be given great weight.

Here the intention of the parties could not be any clearer. The Lease Agreement clearly states that "the parties intend to create by this Agreement the relationship of COMPANY and INDEPENDENT CONTRACTOR and NOT that of EMPLOYER AND EMPLOYEE." The only evidence before the Court of the parties' intention demonstrates that Plaintiff is an independent contractor.

*Id.* at \*9-13 (record and case citations omitted). The *Taylor* Court acknowledged that factor eight, whether the work is an integral part of the business of the employer, weighed in favor of the employee classification. However, the *Taylor* Court ultimately concluded that the overwhelmingly majority of the factors demonstrate an independent contractor relationship. Id. at \*13-14; see also *Lalik v. Roadrunner Dawes Freight System, Inc.*, 2008 U.S. Dist. LEXIS 33491 (N.D. Tex. 2008) (summary judgment granted to trucking company on plaintiff's national origin and sex Title VII claim); *Broussard v. L. H. Bossier, Inc.*, 792 F.2d 1158, 1159 (5th Cir. 1986) (trial court granted defendant trucking company's Rule 41(b) motion with respect to plaintiff's sex discrimination claim

on basis she "was not an employee for Title VII purposes," applying the same 11-factor test as *Taylor*, *supra*).

Although Plaintiff appears to concede that owner-operators are independent contractors, as that term has been defined by the Sixth Circuit and the Ohio courts, Plaintiff argues that owner-operator-lessees are properly characterized as employees for the purposes of the federal and state anti-discrimination statutes.  In her opposition brief, Plaintiff underscores a series of facts, which she contends distinguish an owner-operator-lessee from an owner-operator, in order to support her conclusion that Defendant exercises greater control over owner-operator-lessees.

First, Plaintiff contends that the default provision in the Lease-Purchase Agreement constitutes evidence of increased control exercised over owner-operator-lessees. Plaintiff writes:

> [Defendant] hires owner-operators who drive their own trucks which meet [Defendant's] requirements, while at the same time it leases trucks owned by [Defendant] or its affiliates to [owner-operator-lessees].  Owner-operators are not burdened by the lease agreement which in effect can be terminated within 30 days if [Defendant] exercised its right to end the independent contractor agreement.  The distinction is relevant. If [Defendant] terminates the agreement of an owner-operator after 30 days as permitted, he/she still has a truck which can be used in other endeavors.  In contrast, if [Defendant] chooses to end the agreement of a [owner-operator-lessee], realistically he/she is out of work even if he/she continues payments on the truck, since the truck cannot be used for other purposes.

ECF Dkt. #43 at 8.  To the contrary, Plaintiff conceded, later in her opposition brief, that an owner-operator-lessee could use the truck for other work, with the proviso that he or she must remove Defendant's logo from the truck.[6]  Moreover, Defendant correctly argues that Plaintiff, after she was terminated, could have purchased the truck by refinancing it with another lender.

Next, Plaintiff relies upon the maintenance requirements imposed upon a owner-operator-lessee to argue that Defendant exercises the requisite degree of control to establish an employer-employee relationship.  Plaintiff writes:

> Under the terms of the lease, the [owner-operator-lessee] had far less flexibility in the maintenance of the equipment than the owner-operator.  Under the terms for repairs and alterations to be made by a third -party, prior authorization is required from [Defendant]. [An owner-operator-lessee] also has to make the equipment available to

---

[6]Plaintiff contends that removing the company logo was cost-prohibitive. However, Hammond stated that owner-operators often cover the decals on the truck when they use the truck for personal business. Hammond Dep. at 120.

13

[Defendant] for inspection at such intervals as [Defendant] directs.  Finally, the [owner-operator-lessee] had to keep the equipment free and clear of any mechanic's liens for labor, parts and repairs unless [Defendant] approved.  No such restrictions are placed on an owner-operator under the terms of the Independent Contractor Agreement.

ECF Dkt. #43 at p. 8.  However, Defendant, in its reply brief explains that the alleged "control" exercised over owner-operator-lessees relates not to the individual driver but rather to the security interest that Baylor Leasing maintains in the truck.

The determination of whether a hired party is an independent contractor under the general common law of agency turns on the hiring party's right to control the manner and means by which the product is accomplished.  Here, Plaintiff controlled her own business to the extent that she could operate the truck herself or employ someone else to drive the truck on her behalf.  Furthermore, Plaintiff had the power to determine how and when she operated, insofar as she was free to decline a particular job and to choose routes. Plaintiff conceded that she was not paid on an hourly basis, that she received no paid sick leave, vacation, or retirement benefits, and that Defendant paid no social security or payroll taxes for her.

Instead, Plaintiff relies upon the alleged increased control exercised by Baylor Leasing as a result of the Lease Purchase Agreement. However, because Plaintiff chose to lease a truck from Baylor Leasing, rather than another company, she cannot rely upon her additional responsibilities under the Lease-Purchase Agreement to establish an employee-employer relationship with Defendant. Likewise, although Plaintiff took advantage of certain options offered by Defendant, for instance, renting the Qualcomm unit and using the Comdata card, she conceded at her deposition that she was not required to use these services.  In other words, Plaintiff was not required to purchase or rent any products, equipment or services from Defendant, and, as a consequence, she cannot rely upon her voluntary use of the products and services offered by Defendant as evidence of control exercised by Defendant.

Finally, Plaintiff contends that Baylor Leasing held the title on the truck.  The lease arrangement in this case are common in the transportation industry.  Under federal leasing regulations, an "owner" is defined as "[a] person (1) to whom title to equipment has been issued, or (2) who without title, has the right to exclusive use of the equipment, or (3) who has lawful

14

possession of equipment registered and licensed in any State in the name of that person.  49 C.F.R. 367.2(d).  Here,  Plaintiff had the right to exclusive use of the equipment.

Plaintiff's federal and state claims predicated upon the termination of her Independent Contractor Agreement must fail, because, as an independent contractor, she is not protected by the federal and state anti-discrimination statutes. See *Falls*, 834 F.2d at 613; *Eyerman*, 967 F.2d at 218-219.  Likewise, her state claim predicated upon Defendant's failure to appoint her to an independent contractor position in February of 2010 must fail because her efforts to enter into an independent contractor relationship with Defendant are not protected by state anti-discrimination laws. See R.C. § 4112.02 ("[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the ... sex ... of any person, to ... discriminate against that person with respect to hire ....")

Simply stated, Plaintiff has failed to demonstrate that Defendant exercised sufficient control over her performance to demonstrate that, despite the documented agreement of the parties, she was an employee rather than an independent contractor.  Plaintiff's reliance on the additional responsibilities created by the Lease-Purchase Agreement is misplaced, as those responsibilities resulted from her relationship with Baylor Leasing not Defendant.  Plaintiff's relationship with Baylor Leasing was purely voluntary, as Plaintiff was under no obligation to lease a truck from Baylor Leasing in order to achieve owner-operator status.  Moreover, her reliance on her use of several optional services offered by Defendant to owner-operators is likewise misplaced as she was under no obligation to use those services as a part of the Independent Contractor Agreement.

## IV.  **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED with respect to Plaintiff's federal and state sex discrimination claims, and this matter is dismissed in its entirety. ECF Dkt. #29. A judgment entry dismissing this case with prejudice will be filed contemporaneously with this memorandum opinion and order.

DATE: April 11, 2013          */s/ George J. Limbert*
                              GEORGE J. LIMBERT
                              UNITED STATES MAGISTRATE JUDGE

15